

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MALEKO KERSEY,<br><br>and<br><br>TONY JOHNSON,<br><br>Defendants. | Case No. 3:25-cr-81<br><br>Conspiracy to Commit Mail Fraud<br>18 U.S.C. § 1349<br>(Count One)<br><br>Forfeiture Allegation |

### CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

At all times material to the Criminal Information, unless otherwise stated:

1. Unemployment insurance (UI) is a joint state-federal program that is intended to provide temporary financial assistance to workers who become unemployed through no fault of their own and who meet certain eligibility requirements. Each state administers its own UI program according to guidelines established by federal law, and the Virginia Employment Commission (VEC) administers Virginia's UI program.

2. The U.S. Department of Labor (DOL) funds administrative costs related to the UI program for VEC. The federal UI trust fund finances the costs of administering UI programs, loans made to state UI funds, and half of extended benefits during periods of high unemployment. States can borrow from the federal UI trust fund if their own reserves are insufficient.

3. UI benefits are funded primarily through federal and state employer payroll taxes, which are assessed based on information reported by employers, including wage reports listing,

among other items, individual employees and the wages they were paid in each calendar year quarter. Employers are required to remit unemployment tax payments based on the amount of gross wages reflected in these quarterly wage reports. VEC maintains records of those reports.

4. Virginians who have lost their jobs can apply to VEC to receive UI benefits. To be eligible for Virginia UI benefits, claimants must have had their hours reduced by their employer or been separated from employment altogether. Once VEC approves a claim, the claimant must re-certify unemployment status on a weekly basis. Claimants must also certify that they are ready, willing, and able to work each day during the weeks they are claiming UI benefits. If a claimant meets these requirements, including having received a sufficient amount of wages (as reported by their former employer) prior to separation, they become eligible to receive UI benefits.

5. VEC receives and processes applications for UI benefits through its website. Such applications must include the claimant's personal identifying information (PII), including their name, date of birth, Social Security number, address, and phone number, among other information.

6. After VEC processes and authorizes the claim, a financial institution, pursuant to a contract with VEC, receives and disburses the authorized benefits, either by direct deposit into the account the claimant designates to receive such funds or onto a prepaid debit card mailed to the address included in the claimant's UI application.

7. In instances where the claimant elects to receive UI benefits through a prepaid debit card, VEC UI benefits are credited to prepaid debit cards issued by Comerica, Inc., pursuant to a contract between VEC and Comerica's account servicer, Conduent, Inc.

8. Once the initial claim is approved, the claimant can then file to receive benefits on a weekly basis by certifying online that they remain unemployed and eligible for benefits. VEC receives and processes these certifications through its website. Based on the claimant's

2

certifications, VEC will continue to authorize payment of available UI benefits as described above. Prepaid cards are automatically reloaded with newly disbursed funds via electronic transfers.

9. VEC mails prepaid debit cards via the United States Postal Service (USPS). Each such card bears a unique card number alongside the claimant's name. This information, alone and in conjunction, is a means of identifying the claimant, as defined by 18 U.S.C. § 1028(d)(7), and an access device, as defined by 18 U.S.C. § 1029(e)(1).

10. Only UI benefits can be credited to the prepaid debit cards issued by VEC. Claimants can use such cards to make point-of-sale and retail purchases. Claimants can also transfer UI funds from those cards to another account and withdraw them in cash at automated teller machines (ATMs).

I. **EXPANSION OF UI BENEFITS DUE TO COVID-19 PANDEMIC**

11. On March 13, 2020, the President of the United States declared a national emergency recognizing the threat that the novel coronavirus, known as SARS-CoV-2, and COVID-19, the disease caused by SARS-CoV-2, posed to the nation's healthcare systems. The President also determined that same day that the COVID-19 outbreak constituted an emergency of nationwide scope, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), 42 U.S.C. § 5191(b).

12. On March 18, 2020, the President of the United States signed into law the Families First Coronavirus Response Act, which provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

13. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law on March 27, 2020. It expanded states' ability to provide UI benefits for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for

regular UI benefits.

14. Specifically, the CARES Act created the Pandemic Unemployment Assistance (PUA) program. Under PUA, states were permitted to provide UI benefits during the COVID-19 pandemic to individuals who do not qualify for regular UI benefits, including business owners, self-employed workers, independent contractors, those seeking part-time employment, and those with a limited work history who were out of business or had significantly reduced their services as a direct result of the pandemic.

15. To qualify for PUA benefits, an individual must not have been eligible for regular UI benefits and be unemployed, partially unemployed, or unable or unavailable to work because of certain specified health or economic consequences of the COVID-19 pandemic.

16. The CARES Act also established the Pandemic Emergency Unemployment Compensation (PEUC) program. PEUC covered most individuals who exhausted all rights to regular UI compensation under state or federal law and who were able to work, available for work, and actively seeking work as defined by state law. PEUC also gave states the flexibility to determine whether an individual was actively seeking work if the individual is unable to search for work because of COVID-19, including because of illness, quarantine, or movement restrictions.

17. Finally, the CARES Act also established the Federal Pandemic Unemployment Compensation (FPUC) program. FPUC allowed states to give an additional $600 per week to individuals collecting regular UI compensation, PEUC, PUA, and other approved state programs. FPUC benefits expired on July 31, 2020.

18. On April 18, 2020, the President further declared that a major disaster existed in all States and territories as a result of COVID-19 pursuant to section 401 of the Stafford Act, 42

U.S.C. § 5170.

19. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency (FEMA) to expend up to $44 billion from the Disaster Relief Funds for lost wage payments, in accordance with section 408(e)(2) of the Stafford Act, 42 U.S.C. § 5174(e)(2). The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance (LWA) to those receiving UI benefits. For example, in the Commonwealth of Virginia the LWA provided an additional $300 per week to claimants who were eligible for at least $100 week in UI compensation. LWA remained available until the authorized funds were expended in or about December 2020.

### The Defendant and Other Individuals

20. TONY JOHNSON was incarcerated during the relevant period at Greensville Correctional and Work Center (Greensville Center) in Jarratt, Virginia, within the Eastern District of Virginia.

21. MALEKO KERSEY, JOHNSON's boyfriend and a resident of LaCrosse, Virginia, located within the Eastern District of Virginia, filed numerous UI claims for incarcerated prisoners.

### Scheme & Artifice to Defraud

22. Beginning from in or about June 2020 through in or about February 2021, in the Eastern District of Virginia, the defendants, MALEKO KERSEY and TONY JOHNSON, knowingly and unlawfully conspired with each other and others, known and unknown, to commit an offense contained within Chapter 63 of Title 18 of United States Code, to wit: knowingly and unlawfully conspired with each other and others, known and unknown, to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent

5

pretenses, representations, and promises, and for the purpose of executing the scheme and artifice, and attempting to do so, caused any matter and thing to be sent and delivered by the United States Postal Service, in violation of Title 18, United States Code, Section 1341.

## Object of the Conspiracy to Commit Mail Fraud

23. The object of the mail fraud conspiracy was for JOHNSON to procure and transfer the PII of other inmates incarcerated at Greensville Center to KERSEY, for KERSEY to file fraudulent UI claims for those incarcerated prisoners, who were ineligible to receive UI benefits. KERSEY and JOHNSON would utilize those fraudulently obtained UI proceeds for their own purposes, and distributed portions of the fraudulently obtained UI proceeds to multiple individuals, including some of the prisoners whose PII JOHNSON and KERSEY had obtained and utilized, as well as the friends and family members of these prisoners.

## Manner and Means of the Conspiracy

The manner and means by which the conspirators carried out the object of the conspiracy included, but were not limited to, the following:

24. From in or about June 2020, through in or about February 2021, KERSEY and JOHNSON agreed to work together to file for fraudulent UI benefits. On a recorded jail call on June 9, 2020, KERSEY informed JOHNSON that KERSEY had filed a UI claim on JOHNSON's behalf. On a recorded jail call on June 17, 2020, KERSEY informed JOHNSON that his UI claim had been approved, and that UI payments would come weekly. KERSEY and JOHNSON both knew that prisoners were not able and available to work because they were incarcerated, and that as such, they were not entitled to UI funds.

25. On a recorded jail call on June 20, 2020, JOHNSON asked KERSEY what she needed to file additional UI claims, and KERSEY responded that she needed a person's name, date

6

of birth, and Social Security number. JOHNSON then passed to KERSEY this PII for three incarcerated individuals, and KERSEY filed a UI application for one of these three prisoners (Prisoner A).

26. The UI applications KERSEY filed for JOHNSON and Prisoner A contained numerous false statements. For example, both applications stated that the prisoner claimants resided at KERSEY's home in LaCrosse, Virginia; that the prisoner claimants were self-employed, business owners, or contractors that were not working because there was "no work"; and that the prisoner applicants' workplace was closed as a result of the COVID-19 pandemic. Knowing the aforementioned statements to be untrue, KERSEY certified that "all of the information I have given on this application is correct," and that she understood "that Federal funds are provided and that the law provides for fines or imprisonment or both" "if I knowingly fail to disclose information or give false information in order to obtain or increase PUA benefits to which I am not entitled."

27. KERSEY filed these two UI applications (for JOHNSON and Prisoner A) from her home in LaCrosse, Virginia, which is within the Eastern District of Virginia.

28. KERSEY elected to have the UI benefits paid via prepaid debit cards, and directed that those cards be mailed to KERSEY's home in LaCrosse, Virginia. VEC mailed to KERSEY's residence, on June 6, 2020, the debit card for JOHNSON's UI claim; and mailed to KERSEY's residence, on June 25, 2020, the debit card for Prisoner A.

29. KERSEY filed weekly certifications with VEC to maintain the flow of UI payments. KERSEY's certifications included false certifications that the claimant had not worked the prior week despite being "able and available for work;" that the claimant had accepted all work offered during the week; and that the claimant was separated from their prior job due to the COVID-19 pandemic. Knowing these certifications to be false, KERSEY certified that "all of the

information I have given on this application is correct," and that she understood "that Federal funds are provided and that the law provides for fines or imprisonment or both" "if I knowingly fail to disclose information or give false information in order to obtain or increase PUA benefits to which I am not entitled."

30. UI payments for JOHNSON totaled $17,056 and lasted until on or about November 8, 2020. UI payments for Prisoner A totaled $13,660 and lasted until on or about August 3, 2020.

31. For these two prisoners, KERSEY directed that the cards be mailed to her own address. For other Greensville Center inmate applications, KERSEY listed on the applications the address of an acquaintance of the co-conspirators or an acquaintance of the prisoner on whose behalf KERSEY had filed the fraudulent application. KERSEY listed a number of addresses on the nine successful UI applications for the purpose of avoiding suspicion from VEC regarding the utilization of one residential address for many UI applicants.

32. For example, KERSEY filed a fraudulent UI claim on behalf of Prisoner B, who did not intentionally provide his PII to JOHNSON or anyone else at Greenville Center, and who did not consent to someone else filing a fraudulent UI claim on his behalf. KERSEY provided an address on Prisoner B's UI application that was located in South Hill, Virginia, less than five miles from KERSEY's home, whereas Prisoner B was in fact a resident of the Hampton, Virginia area, which is over 100 miles from LaCrosse, Virginia. KERSEY subsequently used Prisoner B's prepaid debit card to transfer $3,000 to JOHNSON's prison account over ten transactions. KERSEY made these ten transactions in the name of "Maleko Johnson" (her first name and JOHNSON's last name) and in the names of three family members.

33. In another instance, KERSEY received $1,040 from the girlfriend of Prisoner C in exchange for filing a fraudulent UI application on Prisoner C's behalf. KERSEY directed that the

VEC mail the fraudulently obtained prepaid debit card to Prisoner C's girlfriend in Collinsville, Virginia. KERSEY received $1,040 as a commission for filing the fraudulent UI application and weekly certifications for Prisoner C.

34. From in or about June 2020 through in or about February 2021, the co-conspirators in total successfully submitted fraudulent UI claims for nine prisoners, totaling $136,556, of which VEC was only able to recoup $1,775.62. Thus, $136,556 represents the intended loss of the mail fraud conspiracy and $134,780.38 represents the actual loss of the mail fraud conspiracy.

35. KERSEY submitted one fraudulent UI application that was not paid, and JOHNSON passed KERSEY the PII of five other prisoners for which there is no record of KERSEY filing a UI application.

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendants, MALEKO KERSEY and TONY JOHNSON, are hereby notified that upon conviction of the offense alleged in Count One of this Criminal Information, they shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds traceable to the offense.

The property subject to forfeiture includes, but is not limited to the following:

A sum of money of at least $134,780.38, which represents the proceeds of the offenses charged and which shall be reduced to a money judgment against the defendants in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C § 853(p).

(All in accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461, and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: May 20, 2025        By: _____
                              Shea Matthew Gibbons
                              Assistant United States Attorney